DECISION
{¶ 1} Plaintiffs-appellants, Pamela and William Welch, appeal from a judgment of the Franklin County Court of Common Pleas entered on a jury verdict in favor of appellants and awarding $694.22 in damages, as well as the denial of their motion for new trial. For the following reasons, we affirm.
 {¶ 2} The following relevant facts were adduced at trial. On June 8, 1984, Pamela was involved in a single vehicle collision ("1984 collision"). It was undisputed that as a result of this collision, Pamela suffered serious injuries, including a closed head trauma and an atlanto-occipital dislocation.[1] To repair the dislocation, Pamela underwent a fusion to her neck. Complications arose from this surgery, among them, injury to her vagus nerve and paralysis of her right vocal cord. The trauma Pamela sustained to her neck left it more susceptible to injury.
 {¶ 3} Thereafter, Pamela was involved in four subsequent collisions. The first collision, not at issue herein, occurred on February 2, 1991, when Pamela was a passenger in a vehicle driven by her now husband, William. As a result, Pamela sustained soft tissue injuries. She filed suit to recover damages, and the case proceeded to a jury trial. Expert medical testimony was presented to support Pamela's claims, including the permanency of her injuries. The jury found in favor of Pamela and judgment was entered upon the verdict.
 {¶ 4} Pamela's second collision occurred on October 5, 1993. In this collision, Pamela was a passenger in a vehicle that was rear-ended by a vehicle driven by David Dennis ("1993 collision"). After this collision, Pamela complained of increased pain and tightness throughout her neck and shoulder regions. Pamela was diagnosed as having suffered a strain and sprain of the cervical region, which resulted in myofacial pain syndrome.
 {¶ 5} The third collision occurred on February 7, 1994. Pamela was again a passenger in a vehicle that was involved in a rear-end collision ("1994 collision"); Mary Routson, Pamela's friend, was the driver. In this collision, Pamela suffered a strain and sprain of her neck and back, and aggravated her myofascial pain syndrome.
 {¶ 6} The fourth collision, and the only one at issue on appeal, occurred on January 3, 1997. Here, Pamela was the driver of a vehicle that was rear-ended while stopped at a traffic light by appellee Tommy Richard, an Ameritech employee who was operating an Ameritech truck at the time ("1997 collision"). After the collision, Pamela was taken by ambulance to Grant Riverside Hospital. There, she was evaluated and underwent a complete cervical spine series, which proved to be unremarkable. Pamela was discharged that same day from the emergency room with instructions to rest and take analgesics. Subsequently, however, Pamela complained of other injuries for which she sought treatment. As a result of this collision, Pamela claimed to have sustained injuries to her neck, shoulder, rotator cuff muscles, Vagus nerve, and frontal lobe, aggravated her pre-existing myofascial pain syndrome, and suffered from problems associated with perseverance, inappropriate use of language, improper behavior, and an inability to control mood swings and emotional outbursts. Due to the vulnerability of Pamela's neck from past trauma, she was advised by her physician to wear a neck brace as a prophylactic measure, and thus, was wearing one at the time of the collision.
 {¶ 7} Appellants filed the instant action, which encompassed the 1993, 1994, and 1997 collisions. Negligence was conceded by all three defendant-drivers, leaving only the questions of causation and damages for the jury to decide. Appellants presented lay and expert testimony regarding the nature and extent of the injuries sustained as a result of the 1993, 1994, and 1997 collisions. Volumes of medical records were also admitted into evidence. At the close of their case, appellants requested in excess of 1.4 million dollars in damages.
 {¶ 8} Appellees presented a full and vigorous defense. Counsel for appellees elicited testimony on both direct and cross-examination that supported their theory of the case, which was that Pamela's injuries were "the consequences" of the 1984 collision, and not proximately caused by the 1997 collision. Thus, appellees' strategy was to present evidence that contradicted appellants on critical points.
 {¶ 9} After an 18-day trial, the jury returned a verdict as to all three collisions. With respect to the 1997 collision, the jury awarded appellants damages for past medical bills (Pamela's emergency room visit) in the amount of $694.22. The jury did not award appellants damages for future care and treatment, future medication expenses, medical-related travel expenses, past and future pain and suffering, past and future loss of ability to participate in usual activities, and past and future enjoyment of life. The jury also did not award damages to William for his claim of loss of consortium.
 {¶ 10} Appellants filed a motion for new trial, which the trial court denied. While that motion was pending, appellants settled their claims with David Dennis (1993 collision) and Mary Routson (1994 collision) by enforcing the high-low agreements entered into with these parties during trial. As it relates to the 1997 collision, appellants timely filed a notice of appeal, asserting the following five assignments of error:
FIRST ASSIGNMENT OF ERROR.
IN CONSIDERATION OF HER JUDGMENT ENTRY OF JUNE 15, 2001, AND HER DECISION AND JUDGMENT ENTRY OF SEPTEMBER 17, 2004, THE TRIAL JUDGE ABUSED HER DISCRETION BY ERRONEOUSLY DENYING THE MOTION FOR NEW TRIAL OF APPELLANTS PAMELA WELCH ("MRS. WELCH") AND WILLIAM WELCH ("MR. WELCH") (JOINTLY," APPELLANTS") SINCE THE JURY VERDICT REACHED REGARDING THE AUTOMOBILE COLLISION OF JANUARY 3, 1997 ("1997 COLLISION"), AND THE SUBJECT JUDGMENT ENTRIES ARE IN DIRECT OPPOSITION TO THE HOLDING OF THE C.E. MORRIS CO. V. FOLEYCONSTRUCTION CO. (1978), 54 OHIO ST.2D 279.
SECOND ASSIGNMENT OF ERROR.
IN HER DECISION AND JUDGMENT ENTRY, THE TRIAL JUDGE ABUSED HER DISCRETION BY ERRONEOUSLY DECLINING TO GRANT APPELLANTS' MOTION FOR A NEW JURY TRIAL WHEN SHE FAILED TO CONCLUDE THAT THE JURY VERDICT RESULTED FROM PASSION OR PREJUDICE EVIDENCED BY THE JURY'S ASSESSMENT OF APPELLANTS' DAMAGES AT SUCH A DISPROPORTIONATELY LOW AMOUNT AS TO SHOCK REASONABLE SENSIBILITIES.
THIRD ASSIGNMENT OF ERROR.
IN HER DECISION AND JUDGMENT ENTRY, THE TRIAL JUDGE ERRED IN FAILING TO DETERMINE THAT THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.
FOURTH ASSIGNMENT OF ERROR.
THE TRIAL COURT ERRED BY ENTERING JUDGMENT ON THE JURY'S VERDICT WHICH WAS CONTRARY TO LAW.
FIFTH ASSIGNMENT OF ERROR.
BY DELAYING ISSUANCE OF HER DECISION AND ENTRY OF SEPTEMBER 17, 2004, FOR SUCH AN UNCONSCIONABLY LONG TIME IN THE AFTERMATH OF APPELLANTS' FILING OF THEIR MOTION FOR A NEW TRIAL, I.E., OVER THREE YEARS, THE TRIAL COURT'S UNAVOIDABLY DIMINISHED RECOLLECTION OF THE EVIDENCE IN THIS CASE BY THE TIME OF HER RULING AMOUNTS TO PREJUDICIAL ERROR WHICH MILITATES THAT APPELLANTS BE ACCORDED THE BENEFIT OF FAVORABLE APPELLATE REVIEW OF THE MERITS OF THEIR MOTION FOR NEW TRIAL.
 {¶ 11} We will address appellants' first four assignments of error together, as they present inextricably related questions. In these assignments of error, appellants contend the trial court erred by entering judgment because the evidence regarding appellants' damages was unconverted at trial, and therefore, the jury's verdict was inadequate, resulted from passion and prejudice, and against the manifest weight of the evidence. Appellants also argue that the verdict awarding damages for past medical expenses, while awarding no other damages is contrary to law.
 {¶ 12} The issue before us concerns the quantum of proof of appellants' alleged injuries, and whether the jury erred in failing to award damages for same. Therefore, we must determine whether the jury's conclusion that appellants did not sustain compensable injuries, other than the award for damages relating to Pamela's emergency room visit, was against the manifest weight of the evidence. We will not reverse this judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence going to all the essential elements of the case. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus.
 {¶ 13} A review of the record discloses that appellees vigorously defended the matter, and contrary to appellants' assertions, evidence relating to the central issues in this case was disputed at trial. Even if the evidence had been uncontroverted, appellants' argument still faces difficulty because it ignores the fact that plaintiffs bear the burden of persuasion on all dispositive issues. Thus, "[a]s long as there are objectively discernable reasons why the jury may have rejected the expert medical testimony, an award less than what the `uncontroverted' medical evidence implies may withstand challenge on appeal." Dottavio v. Shepherd (Dec. 1, 1999), Wayne App. No. 98CA0042, citing Reder v. Antenucci (1989),62 Ohio App.3d 139, 145. At trial, appellees offered the jury such reasons. For ease of clarity, we have discussed the testimony presented at trial in two parts, by first examining the testimony elicited by appellants, and then appellees.
 {¶ 14} Appellants testified as to the extent of their injuries, as did their family and friends. Pamela's mother, Pauline Braun, her brothers, Kevin and Douglas Braun, and her friend, Margaret Long, testified about Pamela's behavioral changes after the 1997 collision. According to their collective testimonies, Pamela displayed a lack of inhibition, used inappropriate language, and was unable to control her changes in mood.
 {¶ 15} Appellants also supported their case by eliciting testimony from several medical professionals regarding the injuries Pamela claimed to have sustained in the 1997 collision. Dr. Maryanne Everhart-McDonald, board-certified in physical medicine, rehabilitation, and electrodiagnosis studies, testified that she began to treat Pamela for the injuries she sustained in the 1993 collision. Dr. Everhart-McDonald explained this collision exacerbated Pamela's pre-existing, post-traumatic myofascial pain syndrome. Dr. Everhart-McDonald also testified that Pamela sustained injuries to her neck and back in the 1994 collision, and aggravated her pre-existing, post-traumatic myofascial pain syndrome. Regarding the 1997 collision, according to Dr. Everhart-McDonald, Pamela sustained neck and shoulder injuries, and suffered an aggravation of her myofascial pain syndrome.
 {¶ 16} Dr. Donlin Long, a board-certified neurosurgeon and chief of neurosurgery at Johns Hopkins Hospital, and Dr. Randy Davis, an orthopedic surgeon at Bay Area Othopaedics and Sports Medicine in Maryland, both testified that as a result of the 1997 collision, Pamela suffered a significant flexion-extension injury to the connective tissues in her neck. According to Dr. Long, as a direct and proximate result of the 1997 collision, Pamela sustained various permanent injuries, including injuries to her neck and the frontal lobe of her brain. He also found the 1997 collision was the proximate cause of Pamela's headaches. With respect to Pamela's frontal lobe injury, Dr. Long explained that the injury manifested in mood swings, changes in short term memory, and uncontrollable emotional outbursts. He also testified that Pamela would "require symptomatic care for the control of symptoms, and that this will include regular visits to physicians, medications." (Tr. Vol. III, at 235.)
 {¶ 17} Another medical expert that testified on appellants' behalf was Dr. L. Arrick Forrest, who began treating Pamela in 1996. Dr. Forrest testified that the 1997 accident caused a permanent injury to Pamela's vagus nerve, which affected her vocal cord and respiratory functioning. Though it was undisputed that Pamela complained of vocal cord paralysis and breathing trouble after the 1993 collision, it was Dr. Forrest's opinion that the 1997 collision caused the permanency of these injuries.
 {¶ 18} Dr. Daniel Clinchot, a board-certified psychiatrist, and Dr. Mary Hill, a rehabilitative psychologist, testified about Pamela's behavioral problems. Dr. Clinchot believed Pamela's behavioral deficits were due to the 1997 collision. Dr. Hill opined that as a result of the 1997 collision, Pamela experienced problems with disinhibition, anger management, and stress management, and further stated these injuries were permanent. Dr. Hill also found Pamela's preservation problem consistent with frontal lobe disinhibition, which was caused by the injury to her frontal lobe.
 {¶ 19} As previously explained, appellees elicited testimony from these same witnesses that buttressed their theory of the case. For example, on cross-examination, Kevin Braun testified that Pamela was essentially housebound from 1991 through 1994 due to her injuries. He also stated he was not aware that Pamela exhibited episodic personality changes while receiving care at a hospital in Iowa in 1987, and did not know that medical professionals there recommended Pamela undergo a psychiatric evaluation. Douglas Braun admitted that he did not know Pamela had suicidal thoughts in 1990 or 1991. Nor was he aware that in 1992, Pamela sought medical care because she was experiencing frontal headaches.
 {¶ 20} Also on cross-examination, Dr. Long admitted that Pamela did not inform him of all of her collisions, and thus, he did not have the benefit of Pamela's complete medical history when diagnosing and treating her. Dr. Long conceded that he based his opinions concerning Pamela's injuries, largely in part, on Pamela's self-reported symptoms. Related to that point, Dr. Long stated that Pamela had difficulty with her memory, and voiced complaints about her health that were not substantiated through further examination. For instance, there was an incident in which Pamela called him daily, complaining that she was leaking spinal fluid, when such was not the case. In response to her conduct, Dr. Long referred Pamela for a psychiatric evaluation. As for his diagnosis that Pamela suffered a traumatic brain injury, Dr. Long explained that his opinion was based on the results of his comparison of cisternograms taken before the 1997 collision, with those taken after the 1997 collision. He conceded that the first cisternogram taken after the 1997 collision was normal, noting that Pamela's frontal lobe injury did not present in 1997, but, rather, sometime in 1998. He testified that he could not testify to a reasonable degree of medical certainty as to when the injury occurred, nor could he testify as to the cause of Pamela's cognitive and behavioral problems.
 {¶ 21} With respect to Pamela's claim that she experienced difficulties swallowing and breathing after the 1997 collision, Dr. Forrest testified that Pamela experienced these same difficulties after the 1984 collision. He explained that the surgical repair to correct Pamela's antlato-occipital dislocation affected her first cervical vertebrae, which is in the area of the vagus nerve. Thus, it was possible that the dislocation, which was life threatening and necessitated surgery, could also cause problems to that nerve. Dr. Forrest testified that in 1996, he suggested Pamela seek a psychological evaluation concerning her complaints of anxiety. He further explained that anxiety can be attributable to many sources, and tends to increase symptomology, such as problems with breathing, of which Pamela complained. He also reported that he saw Pamela on January 3, 1997, and during that visit, she did not mention that she had a collision earlier in the day. Significantly, Dr. Forrest was unable to state, to a reasonable degree of medical certainty, as to what deteriorations, if any, resulted from the 1984, 1993, 1994, or 1997 collisions, individually.
 {¶ 22} Likewise, Dr. Clinchot could not opine whether there was a causal connection between the cognitive problems for which he was treating Pamela, and the 1997 collision. On cross-examination, he conceded that a physician should be somewhat skeptical of medical history self-reported by a patient involved in a lawsuit. He also conceded that Pamela suffered a traumatic brain injury as a result of the 1984 collision, and testified that he did not know whether Pamela had recovered from that injury. In response to a question by the jury, Dr. Clinchot opined that Pamela is on several medications designed to modify her brain functions, and the interactions, if any, between these medications are not fully understood. He also added that the effect these medications had, or could have, on human behavior and/or personality was likewise unknown.
 {¶ 23} Dr. Hill testified that she began treating Pamela in 2000. Dr. Hill explained that Pamela had been in counseling for several years prior to the 1997 collision, and despite the medical records generated by those years of therapy, Pamela requested that Dr. Hill not review those records so that she could form an independent opinion. Dr. Hill conceded that the opinion she offered at her deposition was formulated without having reviewed any of Pamela's prior records, and therefore, those records were not considered when determining a baseline. Dr. Hill also admitted that she deviated from a guideline promulgated by the Center for Disease Control, which directed health care professionals to review a patient's medical records, or some other evidence relating to the occurrence of an injury to the head, in order to diagnose a traumatic brain injury. Dr. Hill testified that Pamela has had a diminished cognitive function since the 1984 collision, and may have suffered a brain injury in the 1984 collision. She also believes that Pamela sustained a traumatic brain injury as a result of the 1997 collision. Dr. Hill also stated that Pamela had a long history of being pre-occupied with her somatic symptoms. In response to a question from the jury, Dr. Hill explained that Pamela's medications could have caused behavioral changes. She further explained that inappropriate doses of medication could cause memory impairment, an agitated state, depression, and anxiety.
 {¶ 24} The treatment records of Dr. Everhart-McDonald disclosed that in January 1994, Pamela complained of headaches in her frontal region, and in fact, she referred Pamela to another physician regarding these headaches. Dr. Everhart-McDonald reported that she treated Pamela on July 21, 1995, and during that visit, Pamela complained of problems with her legs and arms, vision, swallowing, impairment of her left arm and coordination, and decreased endurance. To that end, Dr. Everhart-McDonald opined that the injuries Pamela sustained in the 1997 collision were permanent, and explained that she arrived at this opinion, largely in part, based on Pamela's self-reported symptoms and discussions with Pamela's family.
 {¶ 25} Appellees also presented the testimony of two medical experts. Dr. Robert Thompson, a board-certified neurologist, testified on behalf of the defense. He admitted that Pamela sustained a mild muscle strain to her neck as a result of the 1997 collision, but testified that was her only injury. He did not find evidence of any additional injuries, including any evidence of a traumatic brain injury. Dr. Thompson did not believe that Pamela suffered a brain injury because she never lost consciousness. Although the role that loss of consciousness plays in determining whether a brain injury has occurred has become somewhat controversial, he explained that in his experience, he has "never seen a patient suffer any type of permanent brain injury who did not have significant loss or alteration of consciousness, amnesia, or focal neurologic findings at the time of the accident." (Tr. Trans. X, at 170.) Dr. Thompson testified that it was impossible for Pamela to have suffered a traumatic brain injury because the symptoms did not manifest until after the collision in 1997. Because Dr. Thompson did not believe Pamela suffered a traumatic brain injury, he did not relate Pamela's problems with perseverance, unusual outbursts of anger, and use of inappropriate language to the 1997 collision. Rather, Dr. Thompson found Pamela's behavioral problems were consistent with her pre-1997 treatment for severe emotional problems. He also testified that medication can cause irrational outbursts, memory loss, including the medication Pamela was taking at the time of the 1997 collision. He explained that these medications can have an aggregate effect when taken in combination, and can impair a patient's ability to self-report medical history. Dr. Thompson testified that it was "unheard of" to have long-term problems that would not show up on an MRI, and if the trauma was serious enough to cause permanent problems, then there should be evidence of same on an MRI. According to Dr. Thompson, there were no objective signs of injury to Pamela's spinal cord from the 1997 collision.
 {¶ 26} Another medical expert who testified on behalf of the defense was Dr. Leslie Friedman, a board-certified neurologist, who testified as to Pamela's behavioral issues. Dr. Friedman disputed previous testimony that Pamela's mood swings were caused by the 1997 collision. He explained that Pamela was an angry, frustrated person, and such people tend to have more physical symptomology. He testified there were no significant changes between the independent medical exam ("IME") he performed in 1996, and the one he performed after the 1997 collision. In fact, Dr. Friedman stated that he found no objective evidence to support Pamela's claim that she sustained injuries in the 1997 accident, including evidence of a brain injury. To that end, he did not believe Pamela suffered a traumatic brain injury because such injuries occur immediately after trauma, and here, the manifestation of Pamela's symptoms was severely delayed. Nor did he believe that the 1997 collision caused Pamela's symptomology in her neck to worsen, and asserted that, in fact, her neck should have been stronger due to her previous fusion surgery. He also did not relate Pamela's alleged vocal cord paralysis to the 1997 accident.
 {¶ 27} In addition to the above testimony, volumes of Pamela's medical records were presented at trial. These records depict an extensive, complex medical history, and like the testimony at trial, these records cut both ways. For example, a report penned by Gabriele Ronnett, M.D., on August 15, 1990, evinced that Pamela was referred to him for "evaluation of headaches and neurological deficits." (Defendant's Exhibit B.) Similarly, Dr. Arnold Menezes, a neurologist associated with the University of Iowa who treated Pamela for neurological complaints, noted in a letter dated August 8, 1991, that Pamela suffered from "frontal and vertex headaches" and had "decreased sensation to the left arm and leg." (Defendant's Exhibit C.) As to the status of Pamela's psychological health prior to the 1997 collision, a psychological evaluation performed by Wanda McEntyre, Ph.D., on January 7, 1993, disclosed that Pamela suffered from major depression and experienced suicidal ideations prior to being placed on Zoloft. (Defendant's Exhibit E.) Dr. McEntyre also noted Pamela "has become increasingly disabled due to her chronic pain complaints and is experiencing a significant amount of emotional distress as a result." Id. Also, in a letter dated March 14, 1996, Janice Bosely, Ph.D, Pamela's former psychologist, referred Pamela to another physician for evaluation, and therein, stated that she had been treating Pamela since 1992 for treatment of chronic pain and depression. Dr. Bosley explained that Pamela was "somatically focused, almost to an obsessional level," and believed Pamela's "chronic, ongoing complicated medical problems certainly keep her focused on her multiple physical symptoms and keep her in the patient role." (Exhibit T.)
 {¶ 28} Returning now to the merits of the case, appellants contend the jury's verdict was inadequate, against the manifest weight of the evidence, and cannot be reconciled with the uncontroverted evidence of pain, suffering, medical expenses, and loss of consortium. For this reason, appellants argue that the trial judge should have granted a new trial under Civ.R. 59(A)(6). Appellants also assert they were entitled to a new trial under Civ.R. 59(A)(4) because the disproportionate damages award suggests that the jury either misunderstood or ignored evidence, resulting in a verdict borne of passion or prejudice. Appellants further contend the judgment entered was contrary to law in that it denied them their constitutional right to a meaningful remedy, triggering grounds for a new trial under Civ.R. 59(A)(7).
 {¶ 29} Civ.R. 59(A) permits a new trial to be granted upon the following grounds:
* * *
(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
* * *
(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case; [and]
(7) The judgment is contrary to law[.]
 {¶ 30} In Mannion v. Sandel (2001), 91 Ohio St.3d 318, the Supreme Court of Ohio examined the requirements for granting a new trial. The court was guided by the first paragraph of the syllabus of Rohde v. Farmer (1970), 23 Ohio St.2d 82,262 N.E.2d 685, which provides:
Where a trial court is authorized to grant a new trial for a reason which requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court.
Thus, we review a trial court's decision under the abuse of discretion standard. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 31} Appellants contend, inter alia, that Tasch v.Chancery (Mar. 1, 2002), Ottawa App. No. OT-00-051, 2002-Ohio-873; Lovett v. Wenrich, Montgomery App. No. 19407, 2003-Ohio-4587; Vanbuskirk v. Pendleton (Jan. 18, 1980), Crawford App. No. 3-79-14; Hendrickson v. Maenle (Dec. 20, 1991), Lucas App. No. L-90-366; Crosby v. Lenart (Apr. 19, 1995), Wayne App. No. 2896; Boldt v. Kramer (May 14, 1999), Hamilton App. No. C-980235, discretionally appeal not allowed by87 Ohio St.3d 1404; Farcas v. Detar (1998),126 Ohio App.3d 795, require the jury to have awarded damages as to all of their claims.
 {¶ 32} In Tasch, supra, the jury awarded Mr. Tasch $75,000 for his injuries and awarded $15,000 to Mrs. Tasch on her consortium claim. The Tasches filed a motion for new trial, pursuant to Civ.R 59(A)(6), arguing that the jury failed to award damages for future medical expenses, pain, and suffering. The trial court granted the Tasches' motion, and ordered a new trial on the bases that the jury failed to consider an element of damages that was established by uncontroverted expert testimony and that the verdict was so inadequate as to shock the sense of justice and fairness. The trial court found the jury erroneously failed to award future damages because all experts testified that Mr. Tasch suffered from permanent injury to his left knee.
 {¶ 33} The Sixth District Court of Appeals reversed the trial court, finding that the trial court's analysis ignored relevant testimony from which the jury could have considered when it decided to not award an amount for future damages. It determined the trial court erred in concluding that if the jury believed the medical evidence as presented by appellants, with respect to the proximate causation between the collision and Mr. Tasch's injuries, the jury was required to accept that the permanency of his injuries were proximately caused by the collision. TheTasch court noted the trial court's analysis was contrary to law, and cited the maxim, "[e]ven where the jury is presented with uncontroverted evidence, it may choose to disregard any or all of the evidence." Id., citing Pavon v. Schick (Mar. 17, 2000), Lucas App. No. L-99-1055, citing, Bailey v. Emilio C.Chu, M.D., Inc. (1992), 80 Ohio App.3d 627, 634. Thus, Tasch
does not support appellants' position.
 {¶ 34} In Vanbuskirk, supra, a plaintiff appealed a verdict awarding him damages for medical expenses incurred as a result of injuries he sustained in a car accident. The plaintiff argued that the damages award was inadequate because, while it compensated him for medical expenses, the jury did not award any damages to pain and suffering. In reversing the trial court's judgment, the Third District Court of Appeals explained, "[w]hile the jury could have by virtue of issues of credibility and conflicting testimony eliminated many other bases for damage it is impossible to eliminate the necessity of a finding of some even though minimal amount of pain as a predicate for this medical treatment." Id.
 {¶ 35} In Hendrickson, supra, the Sixth District Court of Appeals upheld the trial court's granting of a motion for a new trial where the jury had awarded a portion of the plaintiff's medical expenses, but made no award for pain and suffering. The bases of the Hendrickson court's decision was that the evidence was unrefuted as to Hendrickson's experience of at least some pain and suffering, which was supported by objective medical findings, and Manele's failure to present any evidence tending to dispute the longevity of Hendrickson's pain and the treatment for her injuries, or Hendrickson's experienced pain and suffering. Thus, the appellate court held that because the jury concluded Hendrickson sustained injuries caused by the collision, the evidence relating to which was unrefuted, the award of zero damages for pain and suffering was not supported by the evidence.
 {¶ 36} In another case cited by appellants, Lovett v.Wenrich, Montgomery App. No. 19497, 2003-Ohio-4587, Wenrich admitted negligence and the jury was instructed to determine the extent of Lovett's damages. The jury heard from Lovett's treating physician and two medical experts, all of whom testified that Lovett's injuries were caused by the motor vehicle accident. The evidence presented at trial was undisputed, yet, the jury returned a verdict for Lovett in the amount of zero dollars. Lovett filed a motion for a judgment notwithstanding the verdict, or in the alternative, a motion for new trial. The trial court denied that motion. In reversing that judgment, the Second District Court of Appeals explained that given the undisputed medical testimony presented at trial, "the jury could have found that very minimal damages were necessary, but the jury could not reasonably have made a finding of zero dollars in damages." Id. at ¶ 38. Thus, the verdict was against the manifest weight of the evidence because Lovett was entitled to, at least, some compensation for the treatment he received.
 {¶ 37} In Farcas, supra, Farcas was injured in an automobile collision with Detar, and appealed a damage award of $9,796.35, which represented the amount of her medical expenses. The Ninth District Court of Appeals noted that the jury obviously believed that Farkas' medical treatment was a direct and proximate result of the collision because it awarded expenses for same. It explained, "[t]he fact that all three experts testified that plaintiff suffers from some kind of chronic condition involving pain as a direct result of the collision, however, did render the evidence of pain and suffering `overwhelming,' and that supports the crux of plaintiff's challenge. Plaintiff's experts both testified that the medical expenses plaintiff incurred in their treatment of her were necessary and reasonable, and were directly caused by the collision. Defendant offered no evidence to contradict those assertions and, in fact, offered evidence through its own expert that plaintiff did suffer some kind of chronic pain due to the collision." Id. at 807.
 {¶ 38} In Crosby, supra, the Ninth District Court of Appeals affirmed the trial court's granting of Crosby's motion for a new trial in an automobile accident case where the total amount of damages awarded equaled Crosby's actual medical expenses, including his estimated future medical expenses. Relying on Miller v. Irvin (1988), 49 Ohio App.3d 96, the Crosby court held that where the evidence demonstrated that pain and suffering occurred, the jury should have awarded damages.
 {¶ 39} Similarly, in Boldt, supra, the First District Court of Appeals stated in its syllabus, "the jury awarded the plaintiff $4,139.15, the amount of her emergency-room medical bill, the trial court erred by denying the plaintiff a new trial on the issue of damages, when the jury made no additional award for pain and suffering; because the jury found that the emergency-room medical expenses were directly and proximately caused by the automobile accident, the plaintiff must have experienced some pain and suffering." Thus, "where the jury awarded the amount of the emergency-room medical expenses as damages, it was required to award Darlene Boldt an amount for pain and suffering for the time immediately following the accident, including the time spent in the emergency room." Id.
 {¶ 40} While the above cases bear some factual resemblance to the case before us, we do not find them persuasive because the evidence in this case was not uncontroverted. This court has consistently held that when a plaintiff receives damages for medical expenses but does not receive an award of damages for past pain and suffering, and the evidence supporting such damages is uncontroverted, the judgment entered is against the manifest weight of the evidence. See, e.g., Sotos v. Miranda, Franklin App. No. 02AP-1273; Berge v. Columbus Community Cable Access
(1999), 136 Ohio App.3d 281; Juarez v. Osterman (Aug. 12, 1999), Franklin App. No. 98AP-1221; Everett v. Flynn (May 23, 1996), Franklin App. No. 95AP-1216; Siders v. ReynoldsburgSchool Dist. (1994), 99 Ohio App.3d 173, 192; Moore v. Jock
(Sept. 5, 1991), Franklin App. No. 91AP-102; Klamfoth v. Wells
(Apr. 21, 1983), Franklin App. No. 82AP-874; Bentley v. Click
(Aug. 15, 1978), Franklin App. No. 78AP-29.
 {¶ 41} Here, although there was evidence for the jury to conclude that Pamela suffered the injuries she claimed as a result of the 1997 collision, this evidence was contradicted. Pamela sustained serious injuries in the 1984 collision, and claimed to have been injured in the 1991, 1993, and 1994 collisions as well. Consequently, Pamela's medical records disclosed that she sought and received extensive treatment pre-dating the 1997 collision for the same problems she claimed to have suffered after the 1997 collision. Thus, there is evidence in the record from which a jury could have reasonably concluded that any pain and suffering Pamela experienced as the result of the 1997 collision was de minimus, and that other pain and suffering she experienced was not related to the 1997 collision, but rather, due to her prior existing conditions.
 {¶ 42} Further, there were no objective signs of injury when Pamela was treated at the emergency room, nor is there any objective medical evidence in the record to support her claims and proximate cause theories. Pamela's credibility was called into question at trial, and the jury may well have found her testimony about the extent of her pain and suffering was not credible. In that case, the jury may well have disregarded testimony offered by Pamela's treating physicians and medical experts because their opinions were necessarily based on Pamela's subjective complaints and the subjective reports of her family. We also find the jury could have doubted the actual existence of Pamela's injuries, and instead, concluded that her complaints were psychosomatic or otherwise resulted from psychological impairment.
 {¶ 43} We recognize a split of authority exists among Ohio courts as to whether a damage award for medical expenses, without an award for pain and suffering, is against the manifest weight of the evidence. See Uhlir v. State Farm Ins. Co., Cuyahoga App. No. 85819, 2005-Ohio-5545 (noting split of authority). After examining the rationale underlying the contrary school of thought, we believe our line of reasoning encompasses the better view. See, e.g., Seymour v. Pearson, Stark App. No. 2005CA00218, 2006-Ohio-961; Metter v. Konrad, Cuyahoga App. No. 85271, 2005-Ohio-4290; Higgins v. Huntsman, Summit App. No. 22564, 2005-Ohio-6920; Baker v. Dorion (2003),155 Ohio App.3d 560; Haller v. Daily, Montgomery App. No. 19420, 2003-Ohio-1941; Botts v. Tibbs (May 24, 1999), Butler App. No. CA98-06-125; Dottavio v. Shepherd (Dec. 1, 1999), Wayne App. No. 98CA0042; Marsico v. Rader (Mar. 5, 1997), Lorain App. No. 96CA006466; Everett v. Flynn (May 23, 1996), Franklin App. No. 95AP-1216. As explained by the Second District Court of Appeals in Haller, supra:
The proposition that an award of medical expenses in a personal injury case without an award for pain and suffering is contrary to law requires the conclusion that there can be no set of facts in a personal injury negligence case in which a plaintiff would be entitled to recover the one type of damages, but not the other. We conclude that this proposition is not supportable. A person may sustain an injury that requires medical treatment, even though the injury is not accompanied by pain or suffering. Although it is not ordinarily the result of a traumatic injury, the onset of cancer, for example, if diagnosed early, is often unaccompanied by pain or suffering, but nevertheless requires medical treatment. Although instances of injury requiring medical treatment, unaccompanied by pain or suffering, may be rare, we are not prepared to hold that these instances can never exist, as a matter of law.
Id. at ¶ 24. We agree with the Haller court's assessment. Further, we believe the reasoning employed by courts that find a verdict is automatically against the manifest weight of the evidence because an award for medical expenses, without an award for pain and suffering, is flawed because it fails to properly consider that the assessment of damages is a matter within the province of the jury. Weidner v. Blazic (1994),98 Ohio App.3d 321, 334. The jury, as the trier of fact, is responsible for determining the credibility of a witness and may believe all, part, or none of a witness' testimony, giving a witness little or no weight at all. Parsons v. Washington State CommunityCollege, Franklin App. No. 05AP-1138, 2006-Ohio-2196, at ¶ 21 (citation omitted). As demonstrated by our discussion above, the record contains objectively discernible reasons, based upon which the jury could have rejected appellants' claims, and concluded that the 1997 collision was not the proximate cause of appellants' injuries.
 {¶ 44} Nor do we agree with appellants' argument that they are entitled to a new trial under Civ.R. 59(A)(4), which states that a trial court may grant a new trial if the moving party proves "excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." As we stated in Miller v. Lindsay-Green, Inc., Franklin App. No. 04AP-848, 2005-Ohio-6366, at ¶ 75, "[a]lthough the size of the verdict is a factor to be considered, it alone does not afford proof of passion or prejudice." (Citations omitted). Rather, "there must be something contained in the record which the complaining party can point to that wrongfully inflamed the sensibilities of the jury." Shoemaker v. Crawford (1991), 78 Ohio App.3d 53, 65. Ultimately, a trial court should not grant a new trial on the basis of passion or prejudice unless the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities. Berge v. Columbus Community CableAccess (1999), 136 Ohio App.3d 281, 317, quoting Pena v.Northeast Ohio Emergency Affiliates, Inc. (1995),108 Ohio App.3d 96, 104.
 {¶ 45} In their motion for a new trial and on appeal, appellants failed to direct our attention to any recorded evidence showing that the jury considered incompetent evidence, or that there was improper conduct which might have influenced the jury. To the contrary, appellants simply argue that the jury verdict was grossly inadequate. Our own careful examination of the record fails to reveal evidence that would demonstrate the jury's sensibilities were wrongfully inflamed.
 {¶ 46} We find our disposition of appellants' arguments above renders appellants' argument that the judgment deprived them of their constitutional right to a meaningful remedy moot. In addition, after reviewing the legal authority relied upon by appellants to support this argument, Sorrell v. Thevenir
(1994), 69 Ohio St.3d 415, Gaines v. Preterm-Cleveland Inc.
(1987), 33 Ohio St.3d 54, and Article I, Section 16, of the Constitution of Ohio, we are not persuaded as to the merits.
 {¶ 47} In a personal injury action, much of the evidence presented at trial is of a subjective nature, and witness credibility takes on paramount importance. Given the case law discussed herein, it was certainly within the jury's prerogative to disbelieve, or reject, some or even all of the evidence presented by appellants. Evidence notwithstanding, it is the plaintiff who bears the burden of proving to the jury, by a preponderance of the evidence, that the defendant's negligence was a direct or proximate cause of the plaintiff's injuries.Gedra v. Dallmer Co. (1950), 153 Ohio St. 258. Here, the jury's award of damages to appellants, or lack thereof, may reflect appellants' failure to establish that the 1997 collision was the direct or proximate cause of the injuries appellants complained of at trial. Based on these facts, this court declines to substitute its judgment for that of the jury with respect to appellants' damage award.
 {¶ 48} Based on the foregoing, the jury's verdict awarding appellants $694.22 in damages, and finding that their other injuries were not proximately caused by the 1997 collision, was supported by sufficient, competent, credible evidence. As such, we find the judgment is not against the manifest weight of the evidence and the trial court did not abuse its discretion in denying appellants' motion for new trial. Appellants' first four assignments of error are not well-taken.
 {¶ 49} In their fifth assignment of error, appellants contend that after a three-year delay, the trial court, "with neither explanation nor apology," issued its decision on September 17, 2004. (Appellant's Brief at 27.) In considering this assignment of error, we note that appellants have not demonstrated that they were prejudiced by the delay, and, in fact, the trial court issued a four-page decision in which it explained its reasoning. While we sympathize with appellants' frustrations concerning the lengthy delay in ruling on their motion, we are also cognizant of the trial court's substantial docket. Appellants do not recite any effort they made to inquire as to the status of their motion, which, as a practical matter, might have resolved the issue. In any event, the trial court's delay in ruling on appellants' motion does not defeat the fact that the trial court did not err in denying appellants' motion for a new trial. Based on the foregoing, we overrule appellants' fifth assignment of error.
 {¶ 50} For the foregoing reasons, appellants' five assignments of error are over-ruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Klatt, P.J., and French, J., concur.
[1] An atlanto-occipital dislocation occurs when the spinal cord is severed at the foraman magnum.